**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **TANISHA VANHORNE** | § | **CAUSE NO.** _____ |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **THE UNIVERSITY OF TEXAS** | § | **Hon.** _____, **Judge** |
| **MEDICAL BRANCH,** | § | |
| **Defendant** | § | |
| | § | |
| | § | **Hon.** _____, **Magistrate** |

**PLAINTIFF'S ORIGINAL COMPLIANT FOR EMPLOYMENT DISCRIMINATION**
**AND DEMAND FOR JURY TRIAL**

**TO THE HONORABLE JUDGE OF SAID COURT:**

   **NOW COMES** Ms. Tanisha Vanhorne, hereinafter called Plaintiff, by and through the

undersigned counsel, Robert Teir, PLLC, complaining of and about The University of Texas

Medical Branch ("UTMB"), hereinafter called Defendant, and for cause of action respectfully

alleges and shows the honorable Court the following:

I.   **NATURE OF THE CLAIMS**

   1.   This is an action for declaratory, injunctive, and equitable relief, as well as for

      monetary damages, to redress Defendants unlawful and discriminatory employment

      practices and retaliation against Plaintiff, including Defendants' unlawful

      discrimination, harassment, and retaliation against Plaintiff because of her race/color,

in violation of §1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et. seq.* ("Title [*2] VII"), and Chapter 21 of the Texas Labor Code, §21.001 *et. seq.* Texas Labor Code, as amended.

2.      Certain state law claims, recognized under the common law of the State of Texas, are also brought herein pursuant to the ancillary jurisdiction of the honorable Court.

3.      The Plaintiff is an experienced and educated patient care professional, who brings a gentle, empathetic, and knowledgeable approach to the sick and injured people at Defendant's hospital, and who also brings her experience and talent as a manager and administrator, including her familiarity with online patient care software.

4.      Despite Plaintiff's qualifications and her enthusiastic, positive manner and approach to her job, Defendant refused, nearly from the first day of her employment, to treat her in an equal manner to her white/Caucasian colleagues.  In her early days in her position, Plaintiff observed that another valuable colleague, who was White, and who was hired after her, received far greater helpful attention, politeness, respect, and courtesy than she did.  For example, Plaintiff was told that she would personally train a new (White) hire; Ms. Vanhorne was honored to do so.  Plaintiff was still relatively new to UTMB herself and knew the new-job jitters and uncertainty that the new hire weas likely feeling.  The new hire did not show up for the training Plaintiff was asked to provide.  No African American or Afro-Caribbean employee, including the Plaintiff, was permitted to skip their training stage.  Plaintiff is also convinced that any African American or Afro-Caribbean who imperiously unilaterally decided not to

show up for assigned training would be disciplined, and likely fired.   Such an indulgence is only the privilege of the favored group at UTMB, its White employees.

5.      Plaintiff then watched as the new and privileged hire was given the new hire's preferred shift, while Plaintiff was involuntarily relegated to the evening shift. Plaintiff was willing to change her shift for the good of her team and her patients, but asked if the change in shift could be delayed a few weeks so she could become gradually used to the changes in her eating and sleeping patterns.  This request was denied, with Defendant insisting that the change occur immediately.  Meanwhile, the privileged more junior employee enjoyed her chosen shift as if UTMB was there to cater to her wishes.

6.      Plaintiff, with the passage of more time, observed the privileged status of a White and more junior employee to morph into a near-royal status, where, not only did the privileged White employee get what she requested from the Defendant, the Defendant ensured that the less privileged employees, UTMB's *Untermenschen,* were policed in language never used to address the privileged class employees.[1]

7.      The disparate treatment, solely on the grounds of Plaintiff's race/skin color, did not cease, and did not let up.  The campaign of dehumanizing and overbearing racial

---

[1] *Untermenschen* is a German term, from Nazi ideology, referring to "inferior races."  It was mostly used to refer to Jews and Slavic peoples, such as Poles, Lithuanians, Ukrainians, Latvians, and Russians.  *See* I. C. B. Dear and M. R. D. Foot, ed., OXFORD COMPANION TO WORLD WAR II (2001) (available at https://www.oxfordreference.com/view/10.1093/acref/9780198604464.001.0001/acref-9780198604464-e-1704).  Oxford's dictionary defines the term as 'a person considered racially or socially inferior.'  *See* Oxford Lexico Dictionary (online at https://www.lexico.com/definition/untermensch).

discrimination included the frequent use by the Plaintiff's (physician) supervisor and co-workers of derogatory comments, which consistently asserted or insinuated that she was inept, stupid, incapable, or slow, because she was African Caribbean (or African American). The campaign of racial debasement included stereotypes and statements that one hardly hears outside of documentaries about racial attitudes in the deep South in the 1870s and 1880s.

8.      Plaintiff has made proper, timely, and administratively-correct complaints about the discrimination she had to endure at her job, and has suffered the consequences in the form of unlawful retaliation for doing so.

9.      When the Plaintiff resisted and eventually complained about the conditions under which she worked because of the incessant, and overt, bigotry and discrimination of the Defendant, the Defendant fought back by retaliating against her, first by dramatically worsening the terms and conditions of the Plaintiff's employment and eventually by terminating her employment with the hospital.

10.     This case is also about national original discrimination because of the bad and disparate treatment Plaintiff received because she is a Jamaican-American. UTMB permitted and even encouraged Plaintiff's colleagues to talk about her Jamaican accent. When Plaintiff reported this hurtful aggravation to her supervisor, the supervisor was uninterested and refused to do anything about it.

11.     Defendants' conduct was knowing, malicious, willful, vile, anachronistic, mean spirited, and showed a reckless disregard for Plaintiff's mental and physical health, as well as a reckless disregard for the effect on the Plaintiff's career and personal dignity.

12.     The campaign of discrimination and retaliation has caused, and continues to cause, Plaintiff to suffer substantial economic and non-economic damages, harm to her professional and personal reputation, and severe mental anguish and emotional distress.

13.     Plaintiff files this suit to redress the unlawful employment practices by Defendant and, also, to prevent and deter future discrimination of this kind, involving other employees, in the future.  Plaintiff seeks both compensatory and punitive damages to accomplish these goals.


II.     **JURISDICTION AND VENUE**

14.     The honorable Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions arising from statutes adopted by Congress and signed into law by the President, regarding the deprivation of Plaintiff's civil rights under Title VII, Section 1981.

15.     The Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

16.     The honorable Court has personal jurisdiction over the Plaintiff because she is a full-time, indeed proud, resident of the State of Texas and she consents to the personal jurisdiction of the honorable Court.

17.     The honorable Court has personal jurisdiction over the Defendant because each Defendant is headquartered and conducts its medical services business in the State of Texas.  *See Industrial Maritime Carriers v. Barwil Agencies A.S.*, 2004 WL 1950322,

at ¶6 (E.D. La. 2004) (federal court has personal jurisdiction over company with offices in the state).  Defendant is also a Texas corporate entity.

18.     Defendant UTMB has acknowledged the personal jurisdiction of federal courts in Texas on numerous occasions by defending employment discrimination (and other) lawsuits filed therein without challenging Plaintiff's statements on personal jurisdiction

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this federal district.


## III.     PARTIES AND SERVICE

20.     Plaintiff, Ms. Tanisha Vanhorne , is an individual whose address is 1725 Fifth Avenue, North, in Texas City, Galveston County, Texas [77590-5435].  The last three numbers of Tanisha Vanhorne's (Texas) driver's license number are 453.  The last three numbers of Ms. Vanhorne's social security number are 738.

21.     Defendant The University of Texas Medical Branch is a corporation based in Texas, and is part of the University of Texas system, and therefore an arm of the state government of Texas.  UTMB is a medical school, research facility, and hospital. UTMB's principal facilities are in Galveston and League City, Galveston County, Texas.

22.     The UTMB hospital where Plaintiff was employed is located at 301 University Boulevard, in Galveston, Texas [77555-5302].

23.     According to the online encyclopaedia Wikipedia, UTMB employees approximately 11,000 people.

24.     UTMB is organized under the laws of the State of Texas, and service of process on the Defendant may be affected pursuant to Rule 4 of the Federal Rules of Civil Procedure.  Service of said Defendant as described above can be affected by personal delivery upon its registered agent for service of process, and by direct communication with UTMB's august legal department.

25.     Plaintiff anticipates that formal service of process will be waived by Defendant.

## IV.     CONDITIONS PRECEDENT

26.     All conditions precedent to the initiation of this lawsuit have been fulfilled.

27.     This suit is brought within ninety days of the Plaintiff's receipt of the 'right to sue' letter from the United States Equal Employment Opportunity Commission.  This letter was sent and received by Plaintiff's counsel, via electronic mail, on March 10, 2021, making Ms. Vanhorne's deadline June 8, 2021.  This pleading was filed with the honorable Clerk of the Court on that date or on a date prior.

## V.     FACTS

28.     Plaintiff Tanisha Vanhorne is a qualified patient services provider and administrator. Plaintiff Vanhorne was hired by Defendant as a Health Unit Coordinator.  She is a consummate professional, dedicated to the mission of Defendant UTMB, to her

professionalism, to her career, and to providing timely, compassionate care to the patients of UTMB.

29.    The Plaintiff is an African-Caribbean woman.

30.    Plaintiff was hired by UTMB in May of 2019 and was employed by the Defendant from July 1, 2019 through September 12, 2019.

31.    From practically her first day of employment at UTMB, Ms. Vanhorne was the target of discrimination, including harassment and an increasingly bitter and hostile work environment.

32.    While Plaintiff's UTMB employment ended eight months ago, and while Plaintiff is now employed elsewhere, she continues to be subject to anguish, depression, nervousness, and difficulties, arising from her treatment at UTMB.  She remains saddened and hurt that such racial discrimination continues into the 21st Century and can occur in the otherwise diverse, welcoming, and progressive Houston region. Plaintiff is also upset that such blatant, raw, hurtful discrimination can occur at one of the area's leading medical care providers.

33.    Ms. Vanhorne interviewed for employment at UTMB on or around May 14, 2019. Ms. Kaitlyn Morrison and Ms. Kaysie Stratton conducted the interview on behalf of UTMB.  The interview seemed normal to the Plaintiff and went well.  Ten days later, on May 24, 2019, she received an offer letter, agreed to it, and signed it.

34.    While Plaintiff was eager to start working at her new position, she informed UTMB that she also wanted to depart the employment she had at the time in a courteous and professional manner, including giving that employer two weeks' notice of her resignation.  UTMB understood and agreed to a July 1, 2019 start date.

35.    Plaintiff began her orientation and her employment with Defendant on July 1, 2019. Her initial training was about the 'Epic' system for entering, maintaining, and accessing patient's medical care data.

36.    On July 5, 2019, Ms. Vanhorne was asked to report for training with Ms. Iesha Freeman, a UTMB Patient Care Technician, in what UTMB called its "11B Unit." Plaintiff trained with Ms. Freeman for approximately four days.  Afterwards, Plaintiff was assigned to the "10B Unit, to train with a colleague named Amy, a Health Unit Coordinator ("HUC").  Plaintiff does not recall this colleague (Amy's) last name. Plaintiff's training with Ms. Amy lasted about two weeks.

37.    During those two weeks, Plaintiff was told that, after her training was completed, she would begin her regular job responsibilities at the "11B" Unit.

38.    While Plaintiff had wanted the second shift, and was hired for the second shift, she was told that she was required to work the morning shift.  Plaintiff wanted to demonstrate that she was a cooperative employee and 'team player.'   She consented to working the morning shift.

39.    A little over one month after Plaintiff's employment with UTMB began, on or about August 8, 2019, Plaintiff was summoned by Ms. Kaylie Stratton, to Ms. Stratton's office.  Ms. Stratton informed Plaintiff that it was "brought to her attention" that Plaintiff had taken an (impermissible) one-hour lunch break.  Plaintiff was not told of the source that brought this to Ms. Stratton's attention, or even the day on which she was alleged to have taken the extended lunch break.

40.   Plaintiff denied that she took a one-hour lunch break, for the simple reason that she had not done so since she began her UTMB employment.  There accusation was not only factually incomplete and anonymous, it was also untruthful.

41.   Ms. Stratton heard the Plaintiff's denial and proceeded to check on the UTMB's time-keeping system, called "Kranos."  The time-keeping system confirmed that Ms. Vanhorne's denial was accurate and that there was no basis to the accusation that she had taken an impermissibly long lunch break.  Ms. Stratton assured Plaintiff that the matter was concluded, and that Plaintiff was not in any trouble.

42.   Less than two weeks after the false long-lunch accusation, on or about August 20, 2019, Plaintiff was told that the Unit would be taking on a new hire, a woman named Julie.  Julie is white and Caucasian.

43.   It did not take long for Plaintiff to notice to that the new hire, Julie, received greater, indeed far greater, care, attention, politeness, respect, and helpful attention from supervisors and management than she did.

44.   Plaintiff was asked to take on the training of Ms. Julie and to teach the new hire the Unit's procedures and information technology systems.  Ms. Vanhorne agreed to do so.  Ms. Vanhorne remembered her new-job jitters and uncertainty and was eager to be helpful in making her new colleague's transition to UTMB easier.

45.   New hire Julie, however, did not show-up for the training Plaintiff was asked to provide.  Plaintiff observed that the new hire received no reprimand for her no-show.

46.   As understanding the procedures and IT systems was vital to working productively in the Unit, Plaintiff discussed the no-show with Ms. Stratton.  Ms. Stratton sternly told

Plaintiff that Julie did not have to show up for the training because Julie already "got it," whatever the 'it' may be.

47. Plaintiff viewed the self-declared lack of need to undergo this otherwise common and ubiquitous training regimen as the privilege of this White employee, not given to her.

48. Around the same time, Plaintiff was asked to change to a 3:00 p.m. to 11:00 p.m. shift.  Once again, she responded cooperatively, agreeing to the change of shift, while asking if she could start on the new shift on August 26, 2019, to help her ease into the new eating and sleeping schedule the new shift would require.  Ms. Stratton responded to Plaintiff that UTMB would not accommodate this request, and that Plaintiff had no choice but to switch to the different, later shift immediately.

49. The reason given for the required immediate shift change was that there was no need for two Health Unit Coordinators in the same morning shift.  Plaintiff realized what this meant: while her subsequently hired colleague, who is White, Julie, was still in training, the White employee was given the more privileged shift, while the more4 senior African-Caribbean employee was requited to adjust to a new shift without any adjustment period, even when Julie was not ready to assume all of her HUC duties because of her remaining training.

50. On or about August 26, 2019, Plaintiff came to work as normal.  When she arrived, she noticed that Ms. Julie and Ms. Stormy Gulley were sitting down, together.  They did not appear to be engaged in anything work-related.  Plaintiff said hello to the two ladies and began her rounds, which was part of her daily job responsibilities.

51.   While making these rounds, Plaintiff noticed that a task that was part of a Health Unit Coordinator's duties and responsibilities was not performed.  As she was trained and instructed to do, Plaintiff documented the incident.  She also asked Colleague Julie, very politely and without accusation, if she (Julie) would assist the Plaintiff in preparing admissions and discharge folders for one patient.

52.   The requested was heard by Ms. Stormy, prompting the latter to raise her voice, yelling at Ms. Vanhorne not to dare to speak to Julie "that way."  Ms. Stormy's verbal attack also included her accusation that Vanhorne had acted "unprofessionally."

53.   Ms. Vanhorne saw that UTMB and her Unit would not tolerate accusations or critiques of its privileged, White, hires.  Still, Plaintiff tried to calm Stormy down, including by politely and respectfully explaining that she (the Plaintiff) was merely asking for a helping-hand.  Plaintiff also denied that she acted unprofessionally in any way.

54.   This prompted Stormy to becomes even more agitated, critical, and defensive.  Stormy, in a mean, nasty tone, wholly unnecessary, demanded that Plaintiff follow her to Ms. Stratton's office to address the "problem."

55.   Plaintiff, though, did not see any problem or issue and therefore did not go with Stormy.

56.   Later, Ms. Stratton came to the Unit.  Ms. Stratton's presence in the Unit was neither unusual nor alarming.  Ms. Stratton asked Stormy and the Plaintiff to accompany her to the Unit breakroom.  There, Ms. Stratton sternly told Plaintiff that Plaintiff was not allowed to act unprofessionally concerning Julie.

57.   Plaintiff again denied ever being unprofessional, with Julie, or with anyone else.  Ms. Stratton's only reply was that Ms. Gulley said that she had acted unprofessionally. Plaintiff was never told, by Ms. Gulley or Ms. Stratton, what the alleged statement, or act, that was deemed unprofessional.  Plaintiff found herself in a Kafkaesque situation, having to defend against a charge about which she lacked facts, the accuser's identify, or the date of the alleged misdeed.

58.   Plaintiff found herself in a Kafkaesque situation, having to defend against a charge about which she lacked facts, the accuser's identify, or the date of the alleged misdeed.  But, the underlying message was clear, to wit that house slaves must not speak of anything Scarlett O'Hara said or did.

59.   This was not to be the end of it.  The next day, on or about August 27, 2019, right after Plaintiff arrived at work, she was told to promptly report to Ms. Stratton's office.  She did so.

60.   Once there, Ms. Stratton told Plaintiff that she wanted to hear "your side of the story."

61.   Plaintiff was able to recollect what happened, and what was said, the previous day. Before doing so, however, she asked whether Ms. Gulley was now her supervisor, and whether it was appropriate to critique and comment on fellow employees' work performance.  Ms. Stratton defensively responded by asking why Plaintiff needed to know such things.  Plaintiff replied that she needed to know so she would know whether she was now required to promptly follow Ms. Gulley's directions, as she would if Gulley were her new, or additional, supervisor.

62.     While in Ms. Stratton's office, Plaintiff shared concerns that she had, primarily that others in the Unit were increasingly and consistently telling Plaintiff to do various tasks, even when Plaintiff was clocked out and on her lunch break.  Plaintiff also reported that she was ordered to clean a discharge room, re-organize an equipment room, and wipe-down Unit equipment.

63.     None of these janitorial-like duties were part of Plaintiff's job.  Based on her information and belief, Plaintiff did not ever see, and does not believe that any White Health Unit Coordinator, or an employee in a similar job, was ever asked to do these cleaning tasks.  It was sadly clear to Plaintiff who were the employees who are selected to proverbially pick the cotton on this planation.

64.     Plaintiff told Ms. Stratton, courteously and respectfully, that such cleaning duties were not what she was hired to do, not part of the job description of a HUC, and that no other person in the Plaintiff's position, or in a similar position, was ever asked to do such things.

65.     Before this discussion ended, Ms. Stratton confirmed that Ms. Gulley was not Plaintiff's supervisor or manager.  Ms. Stratton further confirmed that Plaintiff was not required to obey any instruction or direction from her.

66.     Plaintiff viewed these acknowledgements as an encouraging sign and left Ms. Stratton's office apprehensive, but hopeful.  That upbeat feeling was shortly thereafter disabused and crushed.

67.     On or about August 28, 2019, Plaintiff was summoned back to Ms. Stratton's office. This time, Ms. Stratton informed Plaintiff that she (Ms. Stratton) had received an e-mail, reporting that Plaintiff took "a lot" of breaks during her workday.

68.     This was both surprising and hurtful, because, once again, an accusation lacked a source, date, or detail, and also because, if anything, Plaintiff put in more than her required work time.  Plaintiff did not take breaks for any longer than the permitted time.

69.     Plaintiff sensed and concluded that, if there was such an e-mail (it was never shown to her), there was a campaign in the Unit to make her look bad with false accusations, or possible to make such accusations with an eye towards getting rid of her.

70.     Plaintiff compared her treatment and her plight to how gingerly and pleasant everyone was to Colleague Julie, who had the same job responsibilities as the Plaintiff, was hired after the Plaintiff, but who had no summonses to the supervisor's office to hear vague and anonymous complaints about her conduct.

71.     Plaintiff left this meeting feeling distressed, beaten-down, and worried about her future at UTMB.

72.     On or about August 29, 2019, minutes after Plaintiff arrived at her Unit, she was once again instructed to go to Ms. Stratton's office.  Once there, Ms. Stratton told Plaintiff that there was "a whole lot of stuff" said about her, and that she was writing up Plaintiff about "it."

73.     Plaintiff was baffled that, if there was "a whole lot of stuff" said about her, why none of it was mentioned at the lengthy meeting she had with the same manager just the day before.  Plaintiff concluded that it was extremely unlikely that "a whole lot of stuff" was said about her in the little time between the meeting the day before and this first-thing-on-her-shift meeting.

74.   Plaintiff responded by sincerely pleading that she had done nothing wrong, and that she only tried to do her job the best she can, including trying to get along well with others.

75.   By then, it seemed to your Plaintiff that no one in her Unit liked her or wanted to work with her, or was even willing to work with her.

76.   It also seemed to Plaintiff that her White colleagues felt free to say anything about Plaintiff's work performance and that there was no need for them to first determine whether the statement had any basis in truth.

77.   At this meeting, Plaintiff discussed with Ms. Stratton the fondness UTMB employees had for talking about her, especially about how she spoke.  Plaintiff is Jamaican and speaks with a Jamaican accent.  While Plaintiff is aware of her accent, she also knows, from vast experience, that people raised in the United States easily and routinely understand her, without difficulty.

78.   Plaintiff explained to Ms. Stratton that she felt that she was being picked on, and treated differently, indeed very differently, because of being Jamaican, because she was Black, and because of her accent.

79.   Plaintiff told Ms. Stratton that she was upset and frustrated, and that all she wanted to do was do her job and be free of the anonymous harassment.

80.   No further summons to Plaintiff's supervisor's office occurred in the few weeks after that meeting.  However, things at UTMB did not improve for the Plaintiff.   She continued to be treated as the 'odd person out,' as a person who did not belong, or, worse, could not belong.

81.  On or about September 12, 2019, Ms. Stratton sent the Plaintiff a text messaging,
     demanding that Plaintiff once again come to her office.  This time, Plaintiff was told
     to report to Ms. Stratton "as soon you get to work."  Bracing for yet another vague,
     anonymous accusation, Plaintiff tried to go over, in her mind, what she possibly could
     be accused of this day.  Plaintiff could not think of any misstep or infraction she had
     done.  Resigned to yet another false accusation, and very much exhausted with being
     treated differently and as a second-class person and employee, Plaintiff reported as
     instructed.

82.  When Plaintiff arrived at Ms. Stratton's office, she (Stratton) was not there.  Plaintiff
     took a seat and waited.  Ms. Stratton did not appear.

83.  Instead, a person identifying himself only as 'Jason' came out of a nearby office and
     told the Plaintiff to follow him to the office from whence he came.  Waiting in
     Jason's office was Ms. Kaitlyn Morrison, who participated in Plaintiff's employment
     interview months earlier.

84.  Jason asked Ms. Morrison, in front of Ms. Vanhorne, whether she (Ms. Morrison)
     wanted to do the termination.  Ms. Morrison curtly replied that she did not and that
     she would not terminate Ms. Vanhorne.  Jason did so.

85.  Jason read to the Plaintiff some sort of termination letter or statement.  When he got
     to the point where he said that Ms. Vanhorne's employment was terminated, Plaintiff
     asked him to stop.  Plaintiff said to him that further reading of the letter/statement was
     unnecessary, and that it would be better if he just gave Plaintiff a copy of the
     letter/statement he was reading.  Jason did so.

86.   Jason pointed to a section of the letter and asked Plaintiff to sign the letter.  Ms. Vanhorne responded that, because nothing that Jason was staying about her work performance was true, or, for that matter, even close to accurate, she was not going to sign the letter.  Jason responded by signing the document himself, forgoing the Plaintiff's name, without her permission, right in front of her.

87.   Jason then gave Plaintiff a copy of the letter containing the forged signature.  He then asked Plaintiff to return her security badge to him.  Plaintiff did so and left the facility peacefully and without incident.

88.   Throughout all the months described in these facts, Plaintiff was the only person in her Unit at UTMB of Afro-Caribbean decent.

89.   Plaintiff was also the sole person in her Unit to be to subject to schoolyard-like yelling and shouting by UTMB managerial personnel whenever they cooked up, or "heard from someone" a new baseless accusation of wrongful employment conduct.

90.   Based on information and belief, no White or Caucasian person, at Plaintiff's level or a similar level, ever received any such treatment at UTMB.

91.   The one White and Caucasian employee hired to do a job that was the mirror image of Plaintiff's job, received preferential, deferential, and consistently courteous and accommodating treatment, in the tone used to speak to her, in the collegiality and welcome from other employees, and in the assignment of work shifts.  That privileged, White employee proceeded merrily in her employment path, without people talking behind her back, without false accusations, without fact-less anonymous accusations, without repeated summons to the supervisor's office, without write-ups, and without being terminated.

92.     Throughout the months described here, Plaintiff's UTMB colleagues, with no

        correction or admonition from their supervisors, were open about, and never tried to

        be coy, or silent, about their disdain and bigoted feelings of superiority concerning

        Afro-Caribbean people.

93.     At UTMB, it often feels like the past fifty-seven years never happened, and that

        Texas and the United States never perceived a civil rights movement or Black Lives

        Matter movement, but, rather, were still in the days of segregated water fountains and

        refusals to hire or utilize Black talent for anything except menial jobs.

94.     Plaintiff left UTMB feeling that she not only wasted months of her professional life,

        but also that Defendant never gave her a chance, wanted to give her a chance, or tried

        to give her a chance, to use her talent and experience.  Rather, because of her skin

        color, her birthplace, her accent, and her appearance, she was relegated to be the

        bottom rung on the totem pole by these successors of Bull Connor, James Earl Ray,

        and James Eastland.

95.     What goes on routinely and dreadfully too often at UTMB occurs there because the

        institution tolerates it, because it recruits bigots who are selected by other bigots, and

        results in situations which every other major hospital system in Texas would find

        intolerable and inhumane in the modern era.

96.     On or about January 19, 2020, your Plaintiff filed a complaint of employment

        discrimination and retaliation with the United States Equal Employment Opportunity

        Commission (EEOC).  On March 10, 2021, the EEOC issue her a 'right to sue' letter

        via electronic mail.

97.   The treatment of Plaintiff Vanhorne at her work by the Defendant has caused Ms. Vanhorne to have to suffer emotional pain, extreme stress, anxiety attacks, depression, and other manifestations of mental anguish.

98.   UTMB declined to state, when its posts an employment opening, that it provides an equal opportunity work environment.  Rather, UTMB only promises to "strive" to do so.  ("UTMB Health strives to provide equal opportunity employment without regard to race, color, religion, age, national origin, sex, gender, sexual orientation, gender identity/expression, genetic information, disability, veteran status, or any other basis protected by institutional policy or by federal, state or local laws unless such distinction is required by law").  With and for Tanisha Vanhorne, that striving was weak and failed, miserably.

**VI.   First Cause of Action: Discrimination and Harassment in Violation of Section 1981**

99.   Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 98, inclusive, as if fully set forth herein.

100.   Defendants have discriminated against the Plaintiff on the basis of her race/color (African-Caribbean) in violation of Section 1981, by denying her the same terms and conditions of employment available to employees who are not African-Caribbean, including, but not limited to, subjecting her to disparate working conditions, both physical and environmental, and denying her the opportunity to work in an employment setting free of unlawful harassment.

101.    Defendants have discriminated against Plaintiff on the basis of her race/color in violation of Section 1981 by creating, fostering, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment and mistreatment of Plaintiff because of her race/color.

102.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and draining emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

103.    Defendants' unlawful and discriminatory conduct in violation of Section 1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

**VII.    Second Cause of Action: Retaliation in Violation of Section 1981**

104.    Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 103, inclusive, as if fully set forth herein.

105.    Defendants have retaliated against the Plaintiff in violation of Section 1981 for opposing and/or complaining of Defendant's discriminatory practices against herself

by, *inter alia*, subjecting Plaintiff to acts of discrimination, harassment, and

humiliation, subjecting her to dehumanizing and infantile working conditions.

106.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct in

violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe

mental anguish and draining emotional distress, including, but not limited to,

depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and

self-confidence, emotional pain and suffering, as well as physical injury, for which

she is entitled to an award of monetary damages and other relief.

107.    Defendants' unlawful and retaliatory conduct in violation of Section 1981 was

outrageous and malicious, was intended to injure Plaintiff, and was done with

conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of

punitive (exemplary) damages.


VIII.   **Third Cause of Action: Discrimination and Harassment in Violation of Title VII**

108.    Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 107,

inclusive, as if fully set forth herein.

109.    The Defendant has discriminated against Plaintiff on the basis of her race/color

(African-Caribbean) and/or national origin, in violation of Title VII, by denying her

the same terms and conditions of employment available to employees who are not

African-Caribbean, including but not limited to, subjecting her to disparate working

conditions and denying her the opportunity to work in a normal working employment

environment that is free of soul-crushing and unlawful harassment.

110.    Defendant has also discriminated against Plaintiff on the basis of her race/color and/or national origin in violation of Title VII by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, *inter ali*a, severe and pervasive harassment of Plaintiff because of her race/color and/or national origin.

111.    As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continue to suffer, severe mental anguish and exhausting emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

112.    Defendants' unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.


IX.    **Fourth Cause of Actio**n: **Retaliation in Violation of Title VII**

113.    Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 112, inclusive, as if fully set forth herein.

114.    Defendant retaliated against Plaintiff in violation of Title VII for opposing and/or complaining of Defendant's discriminatory practices against herself by, *inter alia*, subjecting Plaintiff to acts of discrimination, harassment, and humiliation, and

furthering an obnoxious and heinous work environment, including encouraging Plaintiff's co-workers to derive false accusations about Plaintiff's conduct.

115. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which he is entitled to an award of monetary damages and other relief.

116. Defendant's unlawful and retaliatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

## X.     Fifth Cause of Action: Race and Color Discrimination in Violation of the Texas Labor Code

117. Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 116, inclusive, as if fully set forth herein.

118. Defendant has discriminated against Plaintiff on the basis of her race/color (African-Caribbean) and/or national origin, in violation of Chapter 21 of the Texas Labor Code, by denying her the same terms and conditions of employment available to employees who are not African-Caribbean, including, but not limited to, subjecting her to disparate working conditions and denying her the opportunity to work in a normal working employment environment that is free of unlawful harassment.

119.   Defendants have discriminated against Plaintiff on the basis of her race/color and/or national origin in violation of Chapter 21 of the Texas Labor Code by creating, fostering, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment that included, *inter ali*a, severe and pervasive harassment of Plaintiff because of her race/color and/or national origin.

120.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Chapter 21 of the Texas Labor Code, Plaintiff has suffered, and continues to suffer, severe mental anguish and exhausting emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

121.   Defendants' unlawful and discriminatory conduct in violation of Chapter 21 of the Texas Labor Code was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

## XI.   Sixth Cause of Action: Retaliation in Violation of the Texas Labor Code

122.   Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 121, inclusive, as if fully set forth herein.

123.   Defendant retaliated against Plaintiff in violation of Chapter 21 of the Texas Labor Code for retaliating against Plaintiff in violation of the Texas Labor Code because Plaintiff opposed and/or complained about Defendant's discriminatory practices by,

*inter alia*, subjecting Plaintiff to acts of discrimination, harassment, and humiliation, and furthering an obnoxious and heinous work situation, including encouraging Plaintiff's co-workers to derive false accusations about Plaintiff's conduct.

124.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Chapter 21 of the Texas Labor Code, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which he is entitled to an award of monetary damages and other relief.

125.    Defendant's unlawful and retaliatory conduct in violation of Chapter 21 of the Texas Labor Code was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

XII.    **Seventh Cause of Actio**n: **Negligent Hiring, Retention and Supervision**

126.    Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 125, inclusive, as if fully set forth herein.

127.    Defendant UTMB violated its duty as Plaintiff's employer to provide a safe and discrimination-free workplace, to take reasonable steps to determine the fitness of Plaintiff's co-workers and supervisors, and to reasonably supervise Plaintiff's co-workers and supervisors by, *inter alia*, failing and refusing to investigate and/or take appropriate disciplinary or other action in response to Plaintiff's complaints of discriminatory and harassing conduct by her co-workers and/or supervisors on the

basis of her race/color and national origin, thereby permitting and condoning such insulting, degrading, and bigoted conduct.

128.   Defendant UTMB had actual knowledge of the undue risk of harm to which it was exposing Plaintiff because of Plaintiff's complaints to her supervisors about what was going on her Unit.

129.   As a direct and proximate result of Defendant UTMB's breach of duty to supervise, Plaintiff has been injured and has incurred damages thereby.

XIII.   **Eighth Cause of Action: Intentional Infliction of Emotional Distress**

130.   Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 129, inclusive, as if fully set forth herein.

131.   Defendants intentionally or recklessly, by the actions described herein, caused the Plaintiff severe emotional distress, which continues.

132.   Defendant's conduct was extreme and outrageous and proximately caused Plaintiff severe emotional distress.

133.   Plaintiff suffered damages for which Plaintiff herein sues.

**Claim for Legal Fees and Expenses**

134.   Should she prevail, as expected, in this employment discrimination lawsuit, Plaintiff Tanisha Vanhorne is entitled to an award of her legal fees and expenses, pursuant to 42 U.S.C. §2000e-5 (k).

135.    Should she prevail, as expected, in this employment discrimination lawsuit, the Plaintiff is also entitled to an award of her legal fees and expenses, pursuant to §21.259 of the Texas Labor Code.

136.    The Plaintiff respectfully claims for reimbursement of the entirety of her legal fees and expenses, before, during, and following the present suit, as well as her costs of court.


## PRAYER FOR RELIEF

WHEREFORE, your Plaintiff, Tanisha Vanhorne, respectfully prays that the honorable Court enter judgment in her favor and against the Defendant, and grant her at least the following relief:

a)      A declaratory judgment that the actions, conduct and practices of Defendant violate the laws of the United States and the State of Texas;

b)      An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all of her monetary and/or economic harm;

c)      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

d)      An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all of her non-monetary harm, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment,

stress and anxiety, emotional pain and suffering, emotional distress, mental

anguish, and physical injuries;

e)      An award of damages for any and all other monetary and/or non-monetary losses

suffered by Plaintiff in an amount to be determined at trial, plus pre-judgment

interest;

f)      An award of punitive (exemplary) damages;

g)      An award of costs that Plaintiff has incurred in this action; and

h)      An award of the Plaintiff's reasonable attorneys' fees and expenses to the fullest

extent permitted by law.

Plaintiff Tanisha Vanhorne further prays for such other and further relief to which she

might be entitled, or which this honorable Court may deem just and proper, whether in law or in

equity, and whether pursuant to the Constitution, statutes, Rules, regulations, and common law of

the United States, or the Constitution, statutes, and common law of the State of Texas.

**JURY DEMAND**

Respectful of, and exercising, her right under the Seventh Amendment to the Constitution of the United States, your Plaintiff hereby respectfully demands a trial by jury on all issues of fact and damages stated herein.

Dated: Houston, Harris County, Texas

June 7, 2021

Respectfully submitted,

ROBERT TEIR, PLLC
The Headquarters Building
3302 Canal Street
Houston, Texas 77003-1824

By:_____
Robert Teir
Member, College of the State Bar of Texas
State Bar No. 00797940
EM rob@teirlaw.com
PH 832.365.1191
FX 832.550.2700
Attorney for Plaintiff
Ms. Tanisha Vanhorne