Case 3:21-cv-00136   Document 23   Filed on 05/12/22 in TXSD   Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
May 12, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

No. 3:21-cv-136

TANISHA VANHORNE, *PLAINTIFF*,

v.

THE UNIVERSITY OF TEXAS MEDICAL BRANCH, *DEFENDANT*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court is the University of Texas Medical Branch at Galveston's motion to dismiss. Dkt. 15. Having considered the parties' arguments, the pleadings, and the applicable law, the court grants in part and denies in part.

I.  BACKGROUND[1]

The University of Texas Medical Branch at Galveston (UTMB) hired the plaintiff, Tanisha Vanhorne—a self-described "African-Caribbean

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), "all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The "facts" in this section are taken from the plaintiff's pleadings.

woman"—as a health-unit coordinator in May 2019. Dkt. 14 ¶¶ 31–32. She worked for UTMB from July 1, 2019, until her dismissal on September 1, 2019. *Id.* ¶ 33. From nearly the outset of her employment, Vanhorne alleges she "was the target of discrimination, including harassment and an increasingly bitter and hostile work environment." *Id.* ¶¶ 34–35. She alleges that she was "on the receiving end of actions, words, requirements, comments, and attitudes that [UTMB's] non-black employees are not subject to and did not face." *Id.*

Vanhorne alleges that another new hire, a non-black employee named Julie, received greater "care, attention, politeness, respect, and helpful attention from supervisors and management than she did." *Id.* ¶ 49. When Julie was hired, Vanhorne was asked to provide her the same training Vanhorne underwent when she was first hired. But when Julie missed the training, she was not reprimanded. *Id.* ¶ 50, 51. When Vanhorne approached her supervisor, Ms. Stratton, about this discrepancy, Vanhorne was told Julie already "got it." *Id.* ¶ 52. Vanhorne alleges Julie's privilege of not having to undergo the training Vanhorne herself had to take was a result of Julie being white. *Id.* ¶ 53.

Vanhorne was also asked to switch from her morning shift to the 3:00 p.m. to 11:00 p.m. shift because "there was no need for two Health Unit

Coordinators in the same morning shift." Dkt. 14 ¶¶ 54–55. Vanhorne alleges Julie, her junior and still-in-training white co-worker, was given the preferred morning shift at Vanhorne's expense; a position for which Julie was not yet qualified because she had not completed her training. *Id.* ¶ 55.

Vanhorne was also allegedly the subject of a verbal reprimand by another employee, Stormy Gulley. On that occasion, Vanhorne arrived at work for her shift, and seeing Julie had failed to perform a task as part of Julie's morning Health Unit Coordinator duties and responsibilities, sought assistance from Julie in completing the task. *Id.* ¶¶ 57–58. Gulley yelled at Vanhorne not to speak to Julie "that way," and accused Vanhorne of acting "unprofessionally." *Id.* ¶ 57.

Vanhorne attempted to calm Gulley but was unsuccessful. Gulley became "more agitated, critical, and defensive." *Id.* ¶ 59. Gulley demanded Vanhorne follow her to Stratton's office to address the problem. Vanhorne did not do so. *Id.* ¶¶ 60–61. Later, Stratton came to the unit and reprimanded Vanhorne, telling her she "was not allowed to act unprofessionally concerning Julie." *Id.* ¶ 62. Vanhorne was never told what alleged statement or act was unprofessional. *Id.* ¶ 63. Vanhorne alleges she knew of no white employee who was subject to the same vague allegations or who had to

defend themselves "from allegations with a similar degree of racial hostility." *Id.* ¶ 66.

The following day, August 27, 2019, Stratton told Vanhorne she wanted to hear Vanhorne's "side of the story." *Id.* ¶¶ 67-68. Vanhorne told Stratton her concerns of consistently and increasingly being asked "to do various tasks, even when [Vanhorne] was clocked out and on her lunch break." *Id.* ¶ 70. Other tasks Vanhorne was asked to do, outside her job description, included cleaning a discharge room, re-organizing an equipment room, and wiping down equipment. *Id.* ¶ 70. These were tasks Vanhorne never saw a white Health Unit Coordinator, or any white employee in a similar job, perform at UTMB. *Id.* ¶¶ 71–72.

The next day, Vanhorne was once again summoned to Stratton's office, this time relating to an e-mail complaint alleging that Vanhorne took "a lot" of breaks during her workday. Dkt. 14 ¶ 76. The accusation lacked a source, date, or pertinent details. *Id.* ¶ 77. Vanhorne concluded that "if there was such an e-mail (it was never shown to her), there was a campaign in the Unit to make her look bad with false accusations." *Id.* ¶ 78.

The following day, Stratton summoned Vanhorne to her office once again and wrote her up for "a whole lot of stuff" that had been said about her. *Id.* ¶ 81. At this meeting, Vanhorne told Stratton about the "fondness UTMB

employees had for talking about her"—and especially about her Jamaican accent. *Id.* ¶ 86. Vanhorne explained she felt she was being picked on and treated differently because she was Jamaican, black, and spoke with an accent. *Id.* ¶ 88. Moreover, Vanhorne was "upset and frustrated" because "all she wanted to do was do her job and be free of the anonymous harassment." *Id.* ¶ 89.

Vanhorne was not summoned to Stratton's office again until September 12, 2019, when she was met not by Stratton, but by two human-resources employees. *Id.* ¶¶ 91–93. They informed Vanhorne her employment was being terminated and gave her a copy of the termination letter. *Id.* ¶¶ 95–97.

On January 19, 2020, Vanhorne filed a complaint of employment discrimination and retaliation with the Equal Opportunity Employment Commission. Dkt. 14 ¶ 106. On March 21, 2021, the EEOC issued her right-to-sue letter. *Id.* This suit followed.

Vanhorne alleges nine causes of action: (1) discrimination and harassment (§ 1981); (2) retaliation (§ 1981); (3) discrimination and harassment (Title VII); (4) retaliation (Title VII); (5) racially hostile work environment (Title VII); (6) race and color discrimination (Texas Labor Code); (7) retaliation (Texas Labor Code); (8) negligent hiring, retention,

and supervision; and (9) intentional infliction of emotional distress. *Id.* ¶ 109–153.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

A case should be dismissed under Rule 12(b)(1) if the court "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998). Courts should grant a Rule 12(b)(1) motion only if it appears that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction. *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The burden of proof rests with the party asserting jurisdiction. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). To test whether the party asserting jurisdiction has met its burden, a court may rely upon: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996).

### B. Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim is facially

plausible when the pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* "The court does not 'strain to find inferences favorable to the plaintiffs' or 'accept conclusory allegations, unwarranted deductions, or legal conclusions.'" *Vanskiver v. City of Seabrook, Texas*, No. CV H-17-3365, 2018 WL 560231, at *2 (S.D. Tex. Jan. 24, 2018) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Naked assertions and formulaic recitals of the elements of the cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

### III. Analysis

#### A. Sovereign Immunity

The primary basis for UTMB's motion to dismiss is sovereign immunity. Under the Eleventh Amendment, absent waiver, neither a state nor agencies acting under the state's control may be subject to suit in federal court by the state's own citizens or by citizens of another state. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). Eleventh Amendment immunity is a "jurisdictional bar [that] applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984). The Fifth Circuit has held that

UTMB is an agency of Texas that enjoys Eleventh Amendment immunity. *Lewis v. UTMB*, 665 F.3d 625, 630 (5th Cir. 2011). UTMB has attacked all of Vanhorne's claims, with the exception of her claims under Title VII, as barred by the Eleventh Amendment. The challenges are valid.

### i. Section 1981

"Section 1981 contains no congressional waiver of the state's eleventh amendment immunity." *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. 1981); *see also Moore v. Univ. Mississippi Med. Ctr.*, 719 F. App'x 381, 388 (5th Cir. 2018). Accordingly, Vanhorne's claims under Section 1981—race/color discrimination and retaliation—are barred by the Eleventh Amendment.

### ii. Texas Labor Code

UTMB retains its sovereign immunity to claims under chapter 21 of the Texas Labor Code, as the Fifth Circuit has consistently held. *Hernandez v. Texas Dep't of Hum. Servs.*, 91 F. App'x 934, 935 (5th Cir. 2004) (holding "Texas' waiver of sovereign immunity in its own courts, however, is not a waiver of its Eleventh Amendment immunity in federal courts"); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 332 (5th Cir. 2002) (holding chapter 21 of the Texas Labor Code "does not expressly

waive sovereign immunity in *federal* court"). Vanhorne's claims under the Texas Labor Code are thus barred.

### iii. Texas Tort Law

UTMB retains its sovereign immunity to all tort claims. As UTMB notes, the Texas Tort Claims Act contains a limited waiver of Texas' immunity to suit under Texas tort law but does so only in Texas state courts. *Sherwinski v. Peterson*, 98 F.3d 849, 851–52 (5th Cir. 1996); *see also* Tex. Civ. Prac. & Rem. Code § 101.102(a) (2021) ("A suit under this chapter shall be brought *in state court* in the county in which the cause of action or a part of the cause of action arises." (emphasis added)). It is true that, when a state waives its immunity to suit in state court in a statute, it waives its Eleventh Amendment immunity when it removes a lawsuit brought under that statute from state court to federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 617–618, 623–624 (2002). But UTMB did not remove this case; Vanhorne filed it here. Vanhorne's claims under Texas tort law are barred by the Eleventh Amendment.

### B. Title VII Claims

UTMB correctly notes that Title VII, unlike the other statutes relied on by Vanhorne, does abrogate the states' sovereign immunity. *Perez*, 307 F.3d at 326 ("[W]e have long recognized that Congress has clearly abrogated the

states' Eleventh Amendment immunity in enacting Title VII."). Instead, UTMB has moved for dismissal of the Title VII claims against it under Rule 12(b)(6) on the basis that Vanhorne has failed to plead plausible Title VII claims.

### i. Discrimination claim

At the Rule 12(b)(6) stage, the court's analysis of Title VII claims is "governed by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)—and not the evidentiary standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 599 (5th Cir. 2021) (cleaned up). Under *Swierkiewicz*, "there are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an adverse employment action, (2) taken against a plaintiff *because of* her protected status." *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (quotations omitted) (citing *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).

"Although [a plaintiff does] not have to submit evidence to establish a prima facie case of discrimination [under *McDonnell Douglas*] at this stage, [s]he [must] plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make [her] case plausible." *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 470 (5th Cir. 2016). When a plaintiff's Title

VII disparate-treatment discrimination claim depends on circumstantial evidence, as Vanhorne's does, the plaintiff "will 'ultimately have to show' that [she] can satisfy the *McDonnell Douglas* framework." *Cicalese*, 924 F.3d at 767 (quoting *Chhim*, 836 F.3d at 470). "In such cases, we have said that it can be 'helpful to reference' that framework when the court is determining whether a plaintiff has plausibly alleged the ultimate elements of the disparate treatment claim." *Id.* (quoting *Chhim*, 836 F.3d at 470).

Under *McDonnell Douglas*, a plaintiff must establish a prima facie case of discrimination. 411 U.S. at 802. Specifically, a plaintiff must allege facts sufficient to support a finding "that [she] was treated less favorably than others *outside of [her] protected class*." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017). "Accordingly, when a complaint purports to allege a case of circumstantial evidence of discrimination, it may be helpful to refer to *McDonnell Douglas* to understand whether a plaintiff has sufficiently pleaded an adverse employment action taken '*because of*' [her] protected status as required under *Swierkiewicz*." *Olivarez*, 997 F.3d at 600.

Applying those principles here, Vanhorne has plausibly alleged discrimination under Title VII based on her race, color, and national origin. Dkt. 14 ¶¶ 118–22. Contrary to UTMB's protestations, Vanhorne has alleged that a similarly situated employee, Julie, was treated more favorably and is

not a member of the plaintiff's protected class. *Id.* ¶¶ 48–52, 55–58, 62–63, 79. Julie was hired shortly after Vanhorne to the same role but, as Vanhorne alleges, Julie was not subject to the same training requirements, was not disciplined for failing to attend a mandatory training session, and was favored over Vanhorne for the morning work shift. *Id.* ¶¶ 48–58. Combined with the events giving rise to the retaliation and hostile-work-environment claims discussed below, Vanhorne has met her burden in alleging a plausible claim to relief. Accordingly, her Title VII discrimination claim survives.

### ii. Retaliation

For Title VII retaliation claims, "the initial burden rests with the employee to produce evidence: (1) that [she] participated in an activity protected by Title VII, (2) that [her] employer took an adverse employment action against [her], and (3) that there is a causal connection between the adverse employment action and the protected activity." *Alkhawaldeh*, 851 F.3d at 427. The Fifth Circuit "ha[s] consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x. 485, 493 (5th Cir. 2011) (per curiam). Moreover, "Title VII's antiretaliation provisions do not protect employees from 'petty slights, minor

annoyances, and simple lack of good manners.'" *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 827 (5th Cir. 2019).

"However, retaliatory adverse employment actions also need not rise to the level of ultimate employment decisions." *Id.* "[W]hen determining whether an allegedly retaliatory action is materially adverse, courts 'look to indicia such as whether the action affected job title, grade, hours, salary, or benefits or caused a diminution in prestige or change in standing among . . . coworkers." *Id.* (quoting *Paul v. Elayn Hunt Corr. Ctr.*, 666 F. App'x 342, 346 (5th Cir. 2016) (internal quotation omitted)).

Vanhorne has met her burden: her complaints to Stratton referred to the ways in which she viewed her treatment at UTMB as being inconsistent with the position for which she was hired and that it was incongruous with how Vanhorne's non-black co-workers—including other health unit coordinators—were treated. Dkt. 14 ¶¶ 68–74. This complaint was followed the next day by adverse employment actions—being summoned to Stratton's office on August 28, 2019, for a verbal reprimand, being written up on August 29, 2019 (this meeting included additional protected Title VII activity undertaken by Vanhorne when she complained of racial animus against her), and ultimately being terminated from UTMB on September 12, 2019. *Id.* ¶¶ 76–97.

Given the quick sequence of events from Vanhorne's complaints to Stratton to the write-ups and eventual termination—compounded by the less-than-thoroughly-detailed anonymous complaints against Vanhorne that Stratton seemingly took to heart—it is plausible to suspect a causal connection between the protected activity and the adverse employment action. Accordingly, Vanhorne's Title VII retaliation claim survives the motion to dismiss.

### iii. Hostile Work Environment

Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation omitted). This standard requires an objectively hostile or abusive environment—*i.e.*, one that a reasonable person would find hostile or abusive—as well as the victim's subjective perception that the environment is abusive. *Id.*

"There are five elements necessary to set forth a hostile environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome [] harassment; (3) that the harassment was based on [the protected class]; (4) that the harassment affected a "term,

condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action." *Shepherd v. Comptroller of Pub. Accts. of State of Tex.*, 168 F.3d 871, 873 (5th Cir. 1999). Incidents of harassment will not support a hostile-work-environment claim unless a factfinder could reasonably conclude that the harassment was motivated by animus related to the plaintiff's protected class. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012).

"Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hernandez*, 670 F.3d at 651 (quoting *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir.2002)). "The mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment." *Shepherd*, 168 F.3d at 874. "A recurring point in [Supreme Court] opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citation omitted). "Whether an environment is 'hostile' or 'abusive' is determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its

severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Shepherd*, 168 F.3d at 874.

In her complaint, Vanhorne alleges that she was "being picked on, and treated differently . . . because of being Jamaican, because she was Black, and because of her accent." Dkt. 14 ¶¶ 86–88. Vanhorne informed Stratton—her supervisor—that she was "upset and frustrated [by the racially hostile environment and discriminatory actions], and that all she wanted to do was [] her job and be free of the anonymous harassment." *Id.* ¶ 89. Looking at all of the circumstances and the frequency of the alleged harassment—multiple racially charged interactions with co-workers and her supervisor, continuous harassment about her national origin and accent, and frequent anonymous and unsubstantiated complaints against her in the span of just under 10 weeks of employment—Vanhorne has put forward a plausible claim of a hostile work environment in violation of Title VII. Vanhorne's claim survives this stage.

* * *

For clarity, the following claims are dismissed:
- Race/color discrimination under § 1981
- Retaliation under § 1981
- Race/color discrimination under the Texas Labor Code
- Retaliation under the Texas Labor Code
- Negligent hiring, retention, and supervision

- Intentional infliction of emotional distress

The following claims survive:
- Race/color/national origin discrimination under Title VII
- Retaliation under Title VII
- Hostile Work Environment under Title VII

Signed on Galveston Island this 12th day of May, 2022.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE